UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
GABRIEL BROWN,

                              Plaintiff,

                -v-

THE CITY OF NEW YORK, New York City Police
Department Sergeant SALVATORE FERRO (Shield
No. 2819), New York City Police Department Officer
DENISE PITRE (Shield No. 14689), New York City
Police Department Officer JOHN DOE (the name
"John Doe" being fictitious as the true name and rank
is currently unknown to plaintiff), in their individual
capacities,

                              Defendants.
------------------------------------------------------------------x

**COMPLAINT AND DEMAND FOR A JURY TRIAL**

**INDEX NO. 13-CV-2058 (NRB)**

**ECF CASE**

      Plaintiff GABRIEL BROWN, through his attorney ROBERT M. QUACKENBUSH of Rankin & Taylor, PLLC, as and for his complaint, does hereby state and allege:

## PRELIMINARY STATEMENT

1. This is a civil rights action brought to vindicate plaintiff's rights under the First, Fourth and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983.

2. Plaintiff GABRIEL BROWN's rights were violated when officers of the NEW YORK CITY POLICE DEPARTMENT ("NYPD") unconstitutionally and without any legal basis seized and arrested Mr. BROWN and caused him to be prosecuted – all after he fully and expeditiously complied with a purported order to disperse given by an NYPD official during a protest associated with the Occupy Wall Street movement, as the video of the incident clearly shows.

1

3. By reason of defendants' actions, including their unlawful arrest and their false swearing in the criminal court accusatory instrument, Mr. BROWN was deprived of his constitutional rights.

4. Mr. BROWN also seeks an award of compensatory and punitive damages and attorneys' fees.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3-4). This action is brought pursuant to 42 U.S.C. §§ 1983, 1988 for violations of Mr. BROWN's rights under the First, Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States.

6. Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that Mr. BROWN's claims arose in the County of New York, within the confines of this judicial district.

7. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

## PARTIES

8. Plaintiff GABRIEL BROWN is, and was at all times relevant to this action, a resident of the County of Nassau in the State of New York.

9. Defendant THE CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by NYPD.

10. Defendants NYPD Sergeant SALVATORE FERRO (Shield No. 2819), NYPD Officer DENISE PITRE (Shield No. 14689), and NYPD Officer JOHN DOE (the name "John Doe" being fictitious as the true name and rank is currently unknown to plaintiff) (collectively referred to as the individual defendants) are and were at all times relevant herein, officers, employees and agents of the NYPD. The individual defendants are being sued herein in their individual capacities.

11. At all times relevant herein, the individual defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

12. The true name, rank and shield number of defendant Officer JOHN DOE[1] are not currently known to Mr. BROWN. However, DOE was an employee or agent of the NYPD on January 1, 2012, the date of the incident that is the subject of this lawsuit. Accordingly, DOE is entitled to representation in this action by the New York City Law Department ("Law Department") upon his request, pursuant to N.Y. Gen. Mun. L. § 50-k.

13. The Law Department, then, is hereby put on notice (a) that Mr. BROWN intends to name DOE as a defendant in an amended pleading once his true name and rank become known to Mr. BROWN and (b) that the Law Department should immediately begin preparing DOE's defenses, if any, in this action.

---

[1] By using the name "John Doe," Mr. BROWN is making no representations as to the gender of the officer.

14. Defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice and gross disregard for Mr. BROWN's rights.

15. At all relevant times, the defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

16. The incident described herein occurred primarily on 13th Street between Sixth and Fifth Avenues in Manhattan on January 1, 2012 at approximately 2:30 a.m.

17. At approximately the time and place above, Mr. BROWN was standing on 13th Street's north sidewalk while filming a spontaneous street action, or protest march, associated with the Occupy Wall Street movement.[2]

18. Mr. BROWN was at the rear of the march as it attempted to approach Sixth Avenue, walking west.

19. The march stalled, and demonstrators began to mill around.

20. Shortly thereafter, an NYPD official – upon information and belief, NYPD Captain William Taylor – told the demonstrators, through a bullhorn or other amplified sound device, "Keep moving, you're blocking pedestrian traffic."

21. Immediately upon hearing the official's direction to keep moving, Mr. BROWN turned around, away from the march, and began walking east towards Fifth Avenue while remaining on the north sidewalk.

---

[2] Persons associated with Occupy Wall Street come from different backgrounds, including elderly and young people, those with college and graduate degrees and those without institutional schooling, and those with jobs and those who were laid off and are otherwise unemployed. These people come from all racial and ethnic groups and many religions.

A central tenet of Occupy Wall Street is that the growing income inequality in the United States is unjust, unacceptable, and must be rectified. Occupy Wall Street has petitioned the government to redress this grievance through demonstrations in New York City and throughout the country and the world.

22. As Mr. BROWN walked, he noticed several NYPD officers run past him, from the vicinity of the march towards Fifth Avenue.

23. When the officers got to the end of the block (at the intersection of 13th Street and Fifth Avenue), they turned around and appeared to form a makeshift human barricade which served to trap everyone on 13th Street between Sixth and Fifth Streets, thereby making compliance with Captain Taylor's directions a virtual impossibility.

24. Because he was obeying what he understood to be an order to disperse, Mr. BROWN reasonably assumed the officers would leave him alone once he reached Fifth Avenue.

25. However, when he reached the end of the block, a male officer (who is either Sgt. FERRO or Officer DOE) ordered Mr. BROWN to get "up against the wall," grabbed him and arrested him.

26. Several seconds after Mr. BROWN was told to get up against the wall, the camera stopped filming, and Mr. BROWN was placed in plastic handcuffs.

27. Soon after his arrest, Mr. BROWN's "actual" arresting officer "handed off" the arrest to Officer PITRE.

28. Mr. BROWN was then placed into an NYPD vehicle and taken to the NYPD's Seventh Precinct, located near the base of the Williamsburg Bridge in Manhattan.

29. The officers released Mr. BROWN from custody at approximately 9:15 a.m.

30. Accordingly, Mr. Brown was in custody for nearly seven hours.

31. Upon his release, Officer PITRE issued Mr. BROWN a desk appearance ticket which ordered him to appear in criminal court on March 29, 2012 to answer charges of N.Y. Penal Law §§ 240.20(5), (6) – that is, disorderly conduct by blocking vehicular or pedestrian traffic and disorderly conduct by refusing a lawful order to disperse.

32. When Mr. BROWN appeared in criminal court on March 29, 2012, he learned that he was *also* being charged with resisting arrest, a misdemeanor.

33. Specifically, Officer PITRE swore the following to be true under penalties of N.Y. Penal Law § 210.45:

> Deponent states that deponent observed the defendant and numerous other individuals chanting and yelling at the above location. Deponent further states that deponent observed the defendant walk out on to the street and into a lane of vehicular travel.
>
> Deponent further states that deponent observed Captain William Taylor of the Patrol Boro Brooklyn South Task Force instruct the defendant and others to stay on the sidewalk and to keep moving on the sidewalk.
>
> Deponent further states that deponent observed the defendant again walk out on to the street and into a lane of vehicular traffic despite Captain Taylor's instruction.
> Deponent further states that deponent observed that when Captain Taylor attempted to place the defendant under arrest for the above-captioned offense, the defendant pulled defendant's arms away from Captain Taylor, thereby making handcuffing difficult in that deponent and other of Police Officer had to assist Captain Taylor in placing handcuffs on the defendant.

34. Every single statement of Officer PITRE above is a lie and is flatly contradicted by the video taken by Mr. BROWN.

35. Mr. BROWN was *not* "chanting and yelling," as he was not even a part of the Occupy Wall Street demonstration. He was merely filming the demonstrators and the police.

36. Mr. BROWN *never* walked into the street and "into a lane of vehicular traffic."

37. Mr. BROWN did *not* walk into the street after hearing the captain's direction to keep moving. As the video shows, he immediately turned around and began walking *on the sidewalk* towards Fifth Avenue.

38. And, even though New York law permits a person to resist an unlawful arrest, Mr. BROWN did nothing of the sort. He did *not* "pull [his] arms away from Captain Taylor" or any other officer.

39. On March 29, 2012, Mr. BROWN appeared in criminal court to defend himself against the charges.

40. There, the prosecutor offered Mr. BROWN an adjournment in contemplation of dismissal, an offer which Mr. BROWN refused.

41. On April 20 and May 14, 2012, Mr. BROWN appeared in criminal court again to contest the charges. On those dates, he again refused the prosecutor's offer of an adjournment in contemplation of dismissal.

42. Eventually, on September 24, 2012, the criminal court dismissed all of the charges against Mr. BROWN, in their entirety.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
(*Against Sgt. FERRO, Officer PITRE, and Officer DOE*)

43. Mr. BROWN incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

44. Sgt. FERRO, Officer PITRE, and Officer DOE, under color of state law, subjected Mr. BROWN to the foregoing acts and omissions, thereby depriving him of his rights, privileges and immunities secured by the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, including, without limitation, deprivation of the following constitutional rights: (a) freedom from false arrest, false imprisonment, and other unreasonable seizures of his person and property; (b) interference with activity protected by the First Amendment, namely, the filming of the conduct of demonstrators and the police, (c) retaliation for

engaging in activity protected by the First Amendment, namely, the filming of the conduct of demonstrators and the police; (d) freedom from the lodging of false charges against him by police officers; (e) freedom from having police officers fabricate evidence against him; (d) freedom from malicious prosecution by police; and (f) and freedom from abuse of process.

45. Sgt. FERRO, Officer PITRE, and Officer DOE's deprivation of Mr. BROWN's constitutional rights resulted in the injuries and damages set forth above.

## SECOND CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983
(*Against THE CITY OF NEW YORK*)

46. Mr. BROWN incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

47. All of the acts and omissions by Sgt. FERRO, Officer PITRE, and Officer DOE described above were carried out pursuant to overlapping policies and practices of the CITY which were in existence on January 1, 2012 and were engaged in with the full knowledge, consent, and cooperation and under the supervisory authority of the defendant CITY and its agency, the NYPD.

48. The CITY and the NYPD, by their policy-making agents, servants and employees, authorized, sanctioned and/or ratified Sgt. FERRO, Officer PITRE, and Officer DOE's wrongful acts; and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to continue.

49. The acts complained of were carried out by Sgt. FERRO, Officer PITRE, and Officer DOE in their respective capacities as police officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

50. The aforementioned customs, practices, procedures and rules of the CITY and the NYPD include, but are not limited to, the following unconstitutional practices:

    a. Applying an unconstitutionally vague and speech-restrictive interpretation of Penal Law § 240.20(5), disorderly conduct by blocking vehicular or pedestrian traffic, when arresting persons are engaged in activity protected by the First Amendment, even where the alleged blockage of traffic is either brief and fleeting or entirely non-existent; and

    b. Failing to supervise, train, instruct and discipline police officers about the lawful scope of Penal Law § 240.20(5), both on its face and as applied to activity protected by the First Amendment.

51. The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY:

    a. ***Pedine v. City of New York***, 13-CV-1675 (CM) (SN) (S.D.N.Y.). The plaintiff in *Pedine* was standing on the sidewalk and chatting with friends when two police officers walk by. Seeing the officers, the plaintiff told her friends, "I wish they would stop stop-and-frisk." In obvious retaliation for making that statement, an NYPD officer arrest the plaintiff and had her charged with N.Y. Penal Law § 240.20(5), even though she was not blocking any traffic whatsoever. Indeed, she was standing on the sidewalk next to a planter when she made the apparently-incendiary comments.

    b. ***Lambert v. City of New York***, 153046/12 (Sup. Ct., N.Y. Co). The plaintiff in *Lambert* was lawfully participating in a demonstration associated with the Occupy Wall Street movement when she heard an order to disperse. She attempted to comply with the order by finding the nearest point of exit, but, when none could be easily found, and when NYPD officers refused to answer her questions about which direction she should go to comply with the order, NYPD officers placed her under arrest and caused her to be charged with N.Y. Penal Law § 240.20(5).

    c. ***Coleman v. City of New York***, 12-CV-2123 (DAB) (HP) (S.D.N.Y.). The plaintiff in *Coleman* was participating in five-minute long, site-specific work of performance art intended as a commentary on the various occupations found around Wall Street, entitled "Ocularpation: Wall Street." At approximately 7:00 a.m. on a weekday in the financial district, long before the sidewalks became crowded with workers, Coleman took off her shirt and began pretending to walk a dog as part of the performance. Despite the fact there were absolutely no pedestrians on the sidewalk to be blocked, officers arrested her and charged under Penal Law § 240.20(5), charges which were dismissed as being facially insufficient to support the charge.

9

d. ***Halfmann v. City of New York***, 12-CV-1403 (PAC) (S.D.N.Y.). The plaintiff in *Halfmann* was demonstrating blocks from the World Trade Center on the tenth anniversary of the attacks of September 11, 2001. During the memorial ceremony, Halfmann stood in the middle of Church Avenue, which at that time was turned into a pedestrian walkway. While occupying approximately 2.8% of the usable pedestrian path, Halfmann began giving a speech to passersby. During the speech, pedestrian traffic flowed free past Halfmann; absolutely no one had to walk around Halfmann to avoid walking into him. Nevertheless, officers approached and arrested him for violating Penal Law §240.20(5), a charge that was dismissed as facially insufficient to sustain a prosecution.

e. ***Garcia v. Bloomberg***, 11-CV-6957 (JSR) (S.D.N.Y.). The *Garcia* plaintiffs represent a putative class of approximately 700 people arrested on the Brooklyn Bridge roadway as part of a march associated with the Occupy Wall Street movement. As the demonstrators marched over the pedestrian path of the Brooklyn Bridge, pedestrian traffic began to bottleneck near the entrance. In what initially appeared to be an effort to alleviate the bottleneck, NYPD officers led a group of marchers onto the vehicular roadway of the Bridge, then used orange netting to close off the entrance, thereby trapping the demonstrators on the Bridge. Despite obviously lacking the requisite intent or recklessness required under statute, and despite having themselves escorted the demonstrators onto the vehicular roadway, all of the demonstrators on the roadway were arrested and charged with violating Penal Law § 240.20(5).

f. ***Long v. City of New York***, 11-CV-5125 (SAS) (S.D.N.Y.); Colin Moynihan, *Judge to Police: Relax About the "Weed Man,"* N.Y. Times, Dec. 20, 2011, at A32. Joshua Long was repeatedly arrested in Manhattan while lawfully begging and promoting tolerance of marijuana use and marijuana users. Mr. Long would regularly stand on a sidewalk, conscious of staying out of pedestrians' way, and hold a sign reading, "Help! I Need Money for Weed!" Even during the times Mr. Long was not arrested or issued a summons for violating Penal Law 240.20(5), he was regularly ordered by police to "move along" on the pretext he was allegedly blocking pedestrian traffic when, in fact, he was doing no such thing. Mr. Long moved for a preliminary injunction, a motion which was resolved when Mr. Long and the CITY entered into a stipulation, approved by this Court, which read:

> Defendant the City of New York, shall make best efforts to ensure that all New York City Police Department officers assigned to patrol within the territorial boundaries of the Midtown North or Midtown South Precincts (the "Area") will not order, direct, or otherwise communicate to plaintiff Joshua Long that he must move along, leave, vacate, disperse, or otherwise remove himself from the area when he is standing lawfully and peacefully on a public sidewalk, holding a sign or otherwise communicating with passersby. The City of New York's best efforts shall include, without limitation, ensuring that the substance of this Order is communicated to all officers that work in the Area.

(*See* Docket Entry No. 31, Stipulation and Order dated December 19, 2011).

g.  *Hardeman v. City of New York*, 11-CV-3424 (RJH) (S.D.N.Y.); Colin Moynihan, *After Panhandler Says Police Harassed Her, a Judge Tells Them to Stop*, N.Y. Times, Aug. 30, 2011, at A18. The plaintiff in *Hardeman* was repeatedly arrested on Fifth Avenue and charged with violations of Penal Law § 240.20(5) in response to her passive panhandling activity. Evidence submitted in support of Ms. Hardeman's application for a temporary restraining order and preliminary injunction against further arrests showed that, when she panhandled on Fifth Avenue, she occupied a mere 20 inches of a 16 foot wide sidewalk, which is only 5.2% of the width of the sidewalk. (*See* Affidavit of Sojourner Hardeman, Docket Entry No. 14-1). As a result of the Hardeman litigation, the Court approved of a stipulation which resolved the TRO application, as follows:

   i.  The NYPD agreed to re-train members of the Midtown North Precinct by reading the following command at roll call several times per week for several weeks: "The Department reminds you that… New York Penal Law 240.20(5) requires a ***real*** obstruction of vehicular or pedestrian traffic." (*See* Docket Entry No. 17) (emphasis added).

   ii. The City of New York agreed not to arrest or issue a summons to Ms. Hardeman "absent probable cause that she has engaged in criminal activity or committed a criminal offense or violation." (*Id.*)

Given that the City of New York had a pre-existing obligation not to arrest Ms. Hardeman without probable cause, the stipulation resolving the TRO application is a tacit acknowledgment the NYPD had repeatedly misapplied Penal Law § 240.20(5) against Ms. Hardeman as she engaged in passive panhandling, an activity which is clearly protected by the First Amendment.

h.  *Reshke v. City of New York*, 11-CV-2198 (AKH) (S.D.N.Y.); *Ferracane v. City of New York*, 11-CV-6992 (AKH) (S.D.N.Y.). Members of the NYPD's Gang Intelligence Unit made scores of arrests at the 2010 Puerto Rican Day Parade of persons engaged in First Amendment activity by gathering and celebrating their cultural heritage in New York's largest annual parade. The police made these arrests upon the pretext such persons were blocking pedestrian traffic at the parade and for the sole purpose of interrogating the arrestees about suspected links to local gang activity. All fourteen of the *Reshke* and *Ferracane* plaintiffs had their criminal charges dismissed, most of them on the grounds of the facial insufficiency of the allegations to support a charge of Penal Law § 240.20(5).

i.  *Acevedo v. City of New York*, 10-CV-514 (HB) (S.D.N.Y.). Same as *Reshke* and *Ferracane*, except the eight *Acevedo* plaintiffs were arrested at the 2009 Puerto Rican Day Parade.

j.  *Callaghan v. City of New York*, 07-CV-9611 (PKC) (JLC) (S.D.N.Y.). All of the *Callaghan* plaintiffs were arrested, some of them multiple times, in retaliation for their participation in Critical Mass bicycle rides on the last Friday of every month, activity which this Court has held is expressive conduct within the meaning of the

11

      First Amendment. Many of the *Callaghan* plaintiffs were arrested while lawfully riding their bicycles on City streets, and many of those people were charged with violating Penal Law § 240.20(5). The *Callaghan* plaintiffs alleged that they could not have been "blocking" traffic because, as cyclists obeying relevant traffic laws, they *were* traffic.

    k. ***Dunlop v. City of New York***, 06-CV-0433 (RJS) (S.D.N.Y.). The plaintiff in the *Dunlop* matter was arrested while observing arrests of Critical Mass bicycle riders (*see supra*) during the 2004 Republican National Convention and was charged with violating Penal Law § 240.20(5), despite the fact there was no traffic at all around him at the time of his arrest. The act of observing arrests occurring in public is activity protected by the First Amendment, yet the police disregarded Mr. Dunlop's rights and wrongfully arrested him even though there he was not even arguably blocking vehicular or pedestrian traffic.

    l. ***MacNamara v. City of New York***, 04-CV-9216 (RJS) (JCF) (S.D.N.Y.). The *MacNamara* plaintiffs' cases were consolidated from no less than 44 civil cases related to the over 1800 arrests at the 2004 Republican National Convention. Nearly all of the *MacNamara* plaintiffs were engaged in lawful activity protected by the First Amendment, but, despite that fact, hundreds of them were arrested for violating Penal Law § 240.20(5) when they were not actually blocking any traffic whatsoever. *See MacNamara v. City of New York*, 275 F.R.D. 125, 135 (S.D.N.Y.2011).

52. The allegations in the above-referenced matters are hereby incorporated by reference into this complaint.

53. The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and the CITY, including, without limitation, Commissioner Raymond Kelly.

54. All of the above-described acts by Sgt. FERRO, Officer PITRE, and Officer DOE deprived Mr. BROWN of federally protected rights, including but limited to the constitutional rights enumerated in paragraph "44" above.

55. The CITY knew or should have known that the acts alleged herein would deprive Mr. BROWN of his rights, in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution.

56. Despite knowledge of such unlawful *de facto* policies, practices and/or customs, these supervisory and policy-making officers and officials of the NYPD and the CITY, including Commissioner Kelly, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead sanction and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effect of said policies, practices and/or customs upon the constitutional rights of persons in the City of New York.

57. The aforementioned CITY policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned CITY policies, practices and/or customs, Sgt. FERRO, Officer PITRE, and Officer DOE felt empowered to arrest Mr. BROWN for violating Penal Law § 240.20(5) even where it was obvious he was doing nothing that would constitute the blocking of traffic, where it was also obvious he was engaged in activity protected by the First Amendment when filming the conduct of police officers and demonstrators, and where it was also obvious his activity was not conducted "with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof" as required by the disorderly conduct statute.

58. Mr. BROWN's injuries were a direct and proximate result of the CITY and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the CITY and the NYPD to properly supervise, train and discipline their police officers in meaning and lawful scope of Penal Law § 240.20(5),

particularly where applied to activity protected by the First Amendment such as filming police and demonstrators in public places.

59. As such, the CITY's policies, practices, omissions and failures described above were the moving forces behind the violations of Mr. BROWN's constitutional rights.

## JURY DEMAND

60. Mr. BROWN demands a trial by jury in this action on each and every one of his damage claims.

**WHEREFORE**, Mr. BROWN demands judgment against THE CITY OF NEW YORK, Sgt. FERRO, Officer PITRE, and Officer DOE individually and jointly and prays for relief as follows:

a. That he be compensated for violation of his constitutional rights and the harms which naturally resulted from the violations of his rights; and

b. That she be awarded punitive damages against Sgt. FERRO, Officer PITRE, and Officer DOE; and

c. That he be compensated for attorneys' fees and the costs and disbursements of this action; and

d. For such other further and different relief as to the Court may seem just and proper.

Dated: New York, New York
March 27, 2013

Respectfully submitted,

/s/
By: _____
Robert M. Quackenbush
Rankin & Taylor, PLLC
*Attorneys for the Plaintiff*
11 Park Place, Suite 914
New York, New York 10007
t: 212-226-4507
f: 212-658-9480
e: robert@drmtlaw.com